STATE of Tennessee, Appellee,

v.

Billy BEAL, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 6, 1981.

Permission to Appeal Denied by Supreme Court March 16, 1981.

John C. Zimmermann, Asst. Atty. Gen., Nashville, William J. Brown, Asst. Dist. Atty. Gen., Livingston, R. Laken Mitchell, Asst. Dist. Atty. Gen., Cookeville, for appellee.

J. H. Reneau, Jr., J. H. Reneau, III, Celina, for appellant.

## OPINION

DAUGHTREY, Judge.

The appellant-defendant, Billy Beal, was convicted of armed robbery and sentenced to ten years imprisonment. On appeal, he challenges (1) the validity of the indictment returned against him, (2) the propriety of an amendment to that indictment, permitted over his objection, (3) the State's failure to disclose an apparent inconsistency in descriptions of the robber given by the victim, (4) the validity of the victim's in-court identification of the defendant as her assailant, and (5) the voluntariness of the defendant's pretrial statement to police. We find no reversible error in connection with these issues, and we therefore affirm the conviction.

Prior to trial, Beal filed a motion to dismiss the indictment on the ground that the "foreman of the Grand Jury returning said indictment and for many years each and every foreman of the grand jury of Clay County was selected in such a manner so as to discriminate against and systematically and intentionally exclude women [and

blacks] from appointment as Grand Jury Foreman." At the hearing on this motion, the trial judge did not testify concerning his method of selecting grand jury foremen during his almost four years in office. However, the defendant produced evidence that since 1930 only one woman and no blacks had been appointed to head the Clay County Grand Jury. He further proved, statistically, that the proportion of adult white women in the county during that period ranged from 46.6% (1930) to 50.6% (1970), and that the number of black adults ranged from 3.3% (1930) to 2.1% (1970).

The defendant apparently concedes that the grand jury itself reflected a fair cross-section of the community, but he claims that under the ruling in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), he has established a prima facie case of discrimination in the selection of the grand jury foreman and that the proof stands unrebutted by the State. For this reason, he contends, the indictment should have been dismissed. We disagree.

In the first place, we note that Clay County's population includes a relatively small percentage of blacks (the proof showed that there were fewer than 100 blacks over the age of 25 years).[1] Even if the statistics are projected back over a period of ten or more years, the absence of a black foreman may be attributable not to discrimination in the selection process, but to the relatively low percentage of blacks in the general population. Where a disparity may thus be the result of "chance or accident," a prima facie case has not been proven. *Rose v. Mitchell, supra,* 443 U.S. at 571, 574, 99 S.Ct. at 3008, 3009.

On the other hand, the hurdle to adequate proof of a prima facie case with regard to women is not their statistical insignificance in the community, where women admittedly represent some 50% of the general population. Instead, the problem is the low number of overall appointments to the office of Clay County grand jury foreman. During the five years prior to the return of the indictment in this case,[2] for example, only five individuals had held the office, and of these five, one was a woman. Given the relatively small number of appointments, we are not prepared to say that the failure to appoint more women is, prima facie, the result of systematic discrimination based on gender. *Rose v. Mitchell, supra,* 443 U.S. at 571, 574, 99 S.Ct. at 3008, 3009.

Although we decline to reverse on the basis of the statistical record in this case, we nevertheless reiterate the implicit holding of *Rose v. Mitchell* to the effect that discrimination in the selection of the grand jury foreman, based on race or membership in other identifiable groups,[3] if

---

1. Formerly, under T.C.A. § 40–1507, the grand jury foreman or forewoman had to be at least 25 years old in order to serve. This provision was repealed by Acts 1979, ch. 399, § 1, and replaced by Tennessee Rule of Criminal Procedure 6(g). Under the new rule, the qualifications for foreman are the same as those for regular jurors, resulting in a minimum qualifying age of 18 years. T.C.A. § 22–1–101 (formerly T.C.A. § 22–101).

2. The necessity of including women in order to achieve adequate cross-sectional representation on state juries was not clear until 1975. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). *Compare Hoyt v. Florida*, 368 U.S. 57, 61–62, 82 S.Ct. 159, 162, 7 L.Ed.2d 118 (1961); *Teague v. State*, 529 S.W.2d 734, 738 (Tenn.Cr.App.1975). In Tennessee women were statutorily unqualified to serve as jurors prior to the enactment of Acts 1951, ch. 71, §§ 4 and 7. Optional service provided from 1951 on, under former T.C.A. §§ 22–101 and 22–108, was made constitutionally suspect by the opinion in *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and was finally repealed by Acts 1979, ch. 416, §§ 1, 2 (effective May 31, 1979).

3. At the hearing on the defendant's motion to dismiss, the assistant district attorney apparently confused "suspect classification" analysis under the Equal Protection Clause with the "separate or distinct group" analysis utilized in Sixth Amendment and due process cross-sectional representation cases. He thus argued, incorrectly, that *Mitchell v. Rose* does not apply to the appointment of women to the position of grand jury "foreman." This view is clearly unwarranted, in view of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and *Lee v. Missouri*, 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979).

proven, will vitiate the return of an otherwise valid indictment and therefore must be assiduously avoided.

■ The defendant next complains of the trial court's pretrial order permitting amendment of the indictment by deleting a reference to T.C.A. § 39–607 (assault with intent to commit robbery), and replacing it with a reference to T.C.A. § 39–3901 (robbery). He argues that in this action the trial judge violated Tennessee Rule of Criminal Procedure 7(b), which provides:

If no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced, the court may permit an amendment without the defendant's consent before jeopardy attaches.

A review of the indictment indicates that on its face the instrument clearly charges all of the elements of robbery under T.C.A. § 39–3901. It thus appears likely that the inclusion of a reference to T.C.A. § 39–607 was merely an unintentional drafting error. The record also indicates that from the beginning of the lawsuit, the parties treated the charge in the indictment as one of armed robbery, rather than felonious assault. We therefore hold that the amendment did not charge an "additional or different offense" and that it did not "prejudice the substantial rights of the defendant."

The offense charged in the indictment occurred on January 14, 1978, when Neva King, the owner and operator of a small grocery store outside Red Boiling Springs, was robbed at gunpoint by a lone bandit whom she later identified as the defendant, Billy Beal. She testified that on the afternoon of the robbery she had observed a green Pinto repeatedly being driven up and down the road in front of her store. She said that at the time she feared that the grocery was being "cased." The Pinto had two persons inside, one of whom Ms. King thought to be the same man who subsequently robbed her.

At about the time the offense occurred, a witness in the neighborhood saw a green Pinto parked at the side of the grocery store. Because of this connection with the robbery, once the offense came to their attention, law enforcement officers immediately began searching for a green Pinto. Specifically they were trying to locate a white male, "from five-ten to six foot, from 175–195 pounds, [with] black hair, and his eyes were funny," which was the description of the robber given by Ms. King to one of the first officers on the scene. A TBI agent who interviewed her some three days later included in his report a description of the robber, also purportedly given by Ms. King, as being "approximately five foot five and weigh[ing] approximately 185 pounds ... [with] medium length brown hair, light brown eyes, no moustache."

The proof at trial showed the Beal was six feet tall, weighed some 200 pounds, and had black hair. Ms. King testified at trial that she described her assailant to sheriff's deputies as being 5'10" to 6' in height, of stocky build, with dark, slick-backed hair and "distinctive eyes." She said she did not recall telling the TBI agent that the robber was only 5'5" tall with light brown hair, and further testified that if she did, the description was mistaken.

The record tends to suggest that there *was* something "distinctive" about Beal's eyes, apparently involving the way he "blinked" them.

The defendant filed a generalized discovery motion prior to trial, seeking disclosure of all evidence "material to the issues of this case and which may be favorable to the Defendant," including any "exculpatory material in the reports of interviews" by law enforcement officials. The State responded by denying the existence of any discoverable exculpatory evidence. When the apparent discrepancy in descriptions given by Ms. King surfaced during testimony in a pretrial suppression hearing, the defendant insisted that the State was guilty of violating the due process rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He now contends that this action by the State amounts to reversible error.

The State argues in response that any discrepancies in the evidence regarding the robber's description are minor in nature and merely affect the weight to be given the victim's identification of Beal as her assailant. This contention is supported by the holding in *State v. Venable*, 606 S.W.2d 298, 301–302 (Tenn.Cr.App.1980), and that of *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Moreover, these inconsistencies were known to and fully exposed by defense counsel at trial, thereby enabling the jury to properly weigh the in-court identification of the defendant by Ms. King. Evidence produced after the conclusion of the trial concerning another descriptive notation made on a radio dispatcher's logbook, although revealing similar minor inconsistencies, was merely cumulative of other proof introduced at trial. It cannot be said that the "suppression" of the logbook rises to the level of a denial of due process, and we therefore decline to reverse on this basis.

The defendant next challenges the admissibility of the victim's in-court identification of the defendant, on the grounds that it was tainted by an illegal pretrial identification procedure. On January 23, 1978, over a week after the robbery, the defendant was stopped while riding in his green Pinto automobile, in the company of his brother-in-law, J. D. McCarter. The two of them were brought to Ms. King's store, perhaps in handcuffs. A deputy in the grocery store at the time the defendant emerged from the sheriff's patrol car testified that Ms. King, looking through the store window, said immediately and spontaneously upon viewing the defendant, "Oh, my God. That's the man." Another deputy said she started shaking when she saw Beal get out of the car.

The defendant first assails the victim's pretrial identification on the ground that his arrest was illegal because it was not based on probable cause, making the resulting confrontation with the victim likewise illegal. He also insists that the State violated his right to have counsel present at any post-arrest identification procedure. We find no merit to these arguments.

The defendant met the general description of the robber and his car fit the description of the vehicle observed at the scene of the crime on the day of the robbery. Given the small population of Clay County, these two facts taken together are certainly sufficient to justify the defendant's detention for identification purposes, and we find no illegality in the officer's stop and detention of Beal on January 23. Thus, despite the defendant's contentions to the contrary, we conclude that there was no violation of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).

Furthermore, because no arrest warrant had been filed against him at the time he was identified by Ms. King, the right to counsel had not attached, and no Sixth Amendment violation occurred. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn.1980).

However, we do agree with the defendant's contention that the identification procedure in this case was suggestive, and we further find that it was unnecessarily so. There is no apparent justification in the record for what amounted to a single-suspect showup [4] at the scene of the crime, almost ten days after the robbery occurred. Such confrontations have been forcefully and repeatedly condemned and are universally recognized as being inherently suggestive. *See, e. g., Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Marsh v. State*, 561 S.W.2d 767, 769–70 (Tenn.Cr.App.1977). In addition, there was testimony in this case that Beal was presented to the witness while handcuffed, another practice which has been held to be unnecessarily suggestive. *See, e. g., Webb v. Havener*, 549 F.2d 1081 (6th Cir. 1977). Such procedures are recognized as creating a substantial likelihood of

4. Although there was another robbery suspect, McCarter, in custody at the time, there is no evidence that law enforcement officers attempted to present *both* men to Ms. King in a manner calculated to minimize the likelihood of misidentification.

misidentification and are thus to be shunned unless absolutely unavoidable.

This Court noted in *Marsh*, for example, that "in the absence of imperative circumstances, the presenting of a single suspect to a witness is proscribed." *Id.*, 561 S.W.2d at 769. As in *Marsh*, there are no "imperative circumstances" in this case that would permit officers to dispense with the normal lineup procedure for purposes of establishing a suspect's identification. Nor can the identification in the instant case be classified as an "on-the-scene" showup, because of its remoteness in time from the offense. *Compare Johnson v. State*, 596 S.W.2d 97, 103 (Tenn.Cr.App.1979). It follows that the showup in this case was not only suggestive, but unnecessarily so.

■ However, under Tennessee law, as under federal law, the existence of an unnecessarily suggestive identification procedure will not trigger the application of a *per se* rule of exclusion. Instead, the State may elicit in-court identification testimony *if* the prosecution can show that it is not tainted by the pretrial identification procedure. The test is whether the in-court identification is reliable under the "totality of the circumstances," including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Rippy v. State*, 550 S.W.2d 636, 639–40 (Tenn.1977).

The proof at the suppression hearing was that the robber entered Ms. King's store in broad daylight, ostensibly to purchase cigarettes. He was undisguised and remained in the store for several minutes. Ms. King was adamant in her identification of Beal, notwithstanding rigorous cross-examination concerning apparent conflicts in her pretrial descriptions of the robber. She continued to point to the distinctiveness of his eyes,

maintaining that this factor and the presence of the gun had left her with an indelible impression of the robber's face. Moreover, testimony regarding her confrontation with Beal a little over a week after the robbery indicated a high level of certainty on her part at that time; she appeared equally sure of her identification of the defendant at trial. She testified forcefully that her identification of the defendant was based on her recollection of events at the time of the robbery, rather than the later confrontation. Under all these circumstances, we are unable to find reversible error in the trial court's decision to permit Ms. King's in-court identification of Beal.

■ Finally, the defendant contends that an inculpatory statement he made to police in January 1979 was involuntary and should not have been introduced at trial. He alleges that he was induced to confess by promises of leniency made by the District Attorney General. Beal's testimony at trial, however, was to the effect that the prosecutor told him by telephone that if he cooperated and gave a statement, "we'll try to help you reduce the sentence to maybe simple robbery." This evidence falls short of the level of proof necessary to establish an illegal inducement.

■ The record also shows that the defendant was released on bond shortly after he was arrested in January 1978 and subsequently jumped bail. He was apprehended in Illinois a year later and waived extradition, saying that "he had been shot at up in Illinois and he was tired of running . . . [and that] he wanted to come back down here and give himself up . . . [and] get his slate clean." The record fully substantiates the trial judge's determination that the statement given by the defendant after his return to Tennessee was voluntarily and knowingly made. It was thus fully admissible at trial.

In that statement the defendant made a detailed confession of his part in the robbery of the grocery store, which was accomplished with McCarter's assistance. His statement corroborated the information

given law enforcement officers by Ms. King, and it also corroborated her testimony at trial. In view of the confession and the victim's positive identification of the defendant, we have little hesitation in affirming his conviction in this case.

The judgment of the trial court is affirmed.

O'BRIEN and SCOTT, JJ., concur.