Billy BEAL

v.

Jim ROSE, Warden.

No. 81–3522.

United States District Court,
M. D. Tennessee,
Nashville Division.

Nov. 25, 1981.

William Leech, Atty. Gen., John Zimmermann, Asst. Atty. Gen., Nashville, Tenn., for petitioner.

William H. Farmer, Federal Public Defender, Ross Alderman, Asst. Federal Public Defender, Nashville, Tenn., for respondent.

## MEMORANDUM

MORTON, Chief Judge.

This cause came to be heard on October 22, 1981, at which time neither party presented any evidence, it appearing that all material facts are brought forward in the record of state court proceedings. Petitioner, an inmate at the Tennessee State Penitentiary, was committed to the penitentiary to serve a term of 10 years upon being convicted of armed robbery. Judgment was rendered to that effect after a jury verdict in the Criminal Court of Clay County, Tennessee, on October 31, 1979. Efforts to have this conviction set aside by state courts on direct appeal were unsuccessful. *See State v. Beal,* 614 S.W.2d 77 (Tenn.Cr. App.), *permission to appeal denied, id.* (Tenn.1981).

Posited here are four claims by means of which petitioner attacks his conviction pursuant to 28 U.S.C. § 2254. Stated briefly, these claims are:

(1) that petitioner was indicted by a grand jury whose foreperson was selected in a constitutionally impermissible manner;[1]

(2) that the indictment was improperly amended at trial in contravention of Tennessee law;

(3) that petitioner was wrongfully deprived of exculpatory evidence; and

(4) that sentence was pronounced in petitioner's absence, in violation of his right to be present under Tennessee law.

These issues are addressed separately below.

---

**1.** It is not alleged that either the grand jury itself or the petit jury was selected improperly,

## I. Selection of the Grand Jury Foreperson

Prior to trial, petitioner sought dismissal of the indictment against him on the basis that women were excluded in discriminatory fashion from the position of grand jury foreperson in Clay County. The motion was subsequently amended to include a claim that blacks had also been systematically excluded in the selection process. Pursuant to the motion, evidence was presented by petitioner regarding the gender and race of every grand jury foreperson in Clay County from 1930 up to the date of the hearing. In addition, census figures were submitted in order to disclose the percentage of the population in Clay County that represented women and blacks eligible for selection to the grand jury and thereby to the position of foreperson. The state offered no proof. Following the hearing petitioner's motion was denied and the case proceeded to trial.

Petitioner pressed in the state courts and offers here as well the point that of 150 grand jury forepersons chosen in Clay County from 1930 through 1979, only one was female and none were black. This factual matter has not been challenged. Nevertheless, whether such a figure is relevant or is appropriately derived from a legal standpoint has been and remains a controverted issue. Summarized briefly, petitioner's position is that he has presented overwhelming statistical proof that at least women have been excluded from service as grand jury foreperson and that a prima facie case of discrimination thus laid out stands unrebutted.

### A. The State Court Determination

■ The Tennessee Court of Criminal Appeals affirmed the trial court determination that no impermissible discrimination had been proved. *Beal, supra,* 614 S.W.2d 77. On the issue of racial discrimination, the court cited the "relatively small percentage of blacks" in the population of Clay County and concluded that "the absence of a black foreman may be attributable not to

and certainly the proof would not support claims on those bases.

discrimination in the selection process, but to the relatively low percentage of blacks in the general population." *Id.* at 79. This determination is only vaguely challenged here by petitioner. In fact, he hardly argues the point and cites no instance in which the number of black males and females over the age of 25 has exceeded 3.28002% in Clay County, and cites as well lower figures ranging to 2.09698%. At that, the actual number of black citizens over the age of 25 has ranged from a high in 1930 of 121 to a low in 1970 of 80. Thus it appears that the holding of the Court of Criminal Appeals was entirely proper.

With respect to the issue whether gender discrimination had been shown, the Court of Criminal Appeals necessarily approached the statistical evidence in a different manner, as follows:

On the other hand, the hurdle to adequate proof of a prima facie case with regard to women is not their statistical insignificance in the community, where women admittedly represent some 50% of the general population. Instead, the problem is the low number of overall appointments to the office of grand jury foreman. During the five years prior to the return of the indictment in this case, for example, only five individuals had held the office, and of these five, one was a woman. Given the relatively small number of appointments, we are not prepared to say that the failure to appoint more women is, prima facie, the result of systematic discrimination based on gender.

*Id.* at 79 (footnotes and citations omitted). The Court of Criminal Appeals, it should be fair to state in summary, thus did not view the issue of gender discrimination as turning on the statistical insignificance of females as compared to the population in the community, but rather upon their statistical insignificance as compared to the small number of grand jury forepersons whose selection that court was willing to consider.

The position adopted here by respondent that factual findings in the state court should be presumed correct is well taken.

Nevertheless, respondent surely would not argue that this court is compelled to resist in like manner the suggestion that a state court too narrowly construed the legal boundary governing the scope of factual inquiry. It is in this context that the court would delve further into the merits of petitioner's claim.

With respect to the statistical evidence offered by petitioner in the state trial court, the Court of Criminal Appeals was willing to look no further than the selection of five grand jury forepersons prior to the indictment. The court apparently relied to some unspecified degree upon the proposition that "[t]he necessity of including women in order to achieve adequate cross-sectional representation on state juries was not clear until 1975. *See Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975)." 614 S.W.2d at 79 n.2. Nevertheless, the state court was not totally convinced that the year 1975 represented a proper date of limitation, for its own survey stretched back at least as far as early 1974, when the only female ever appointed served as grand jury foreperson in Clay County. Conceding that in *Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), the Court explicitly held that where as in that case a defendant's "opportunity to raise a timely objection to the jury selection procedures had passed" *Taylor* was "not to be applied retroactively, as a matter of federal law, to convictions obtained by juries empaneled prior to the date of that decision," *id.* at 32, 95 S.Ct. at 705, 42 L.Ed.2d at 792, this court would nevertheless find it difficult to hold that *Taylor* necessarily compressed the period of time that a court should be willing to survey in evaluating whether a prima facie case has been made out under *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), and similar cases. In *Mitchell* it might be recalled, the Court cited a failure to provide data covering a "significant period of time." Petitioner has made a concerted effort to avoid any such defect. Finding itself unconvinced that *Taylor* poses a limitation relevant to petitioner's case, the court is likewise unwilling to pull an equally irrele-

vant date out of thin air in order to facilely rebuff him.[2] Such a determination notwithstanding, key issues remain whether petitioner is one entitled to set forth the alleged prima facie case and whether, if it be presumed that he is, the relief requested would be appropriate.

## B. Legal Theories Distinguished

This cause has engendered for whatever reason, an almost subliminal dispute and to some degree confusion regarding the basis upon which relief might be sought. Petitioner molds his argument to a point upon *Mitchell, supra,* but would debark and rest the brunt of his attack upon the sixth amendment as incorporated by the due process clause. Respondent, on the other hand, has persevered in basing his arguments strictly upon the equal protection clause. As a practical matter the parties have left pertinent legal issues unjoined, since their arguments run in essence along parallel lines *usque ad coelum.* It may be said that potential confusion of this type is not apparent here for the first time.[3]

However tempting it might be to blend analysis of due process authority with that relying upon the equal protection clause, an effort will be made here to draw out the strands in differing directions, insofar as separation is deemed proper. However advanced any hybridization process might be,[4] the court does not deem it complete and such as to envelope totally the issues posed in this case. Were a contrary view adopted, petitioner's claim would be much stronger.

An additional distinction that is pertinent in certain respects here as authority is sorted concerns whether a challenge is directed toward selection of a petit jury or a grand jury. On this point as well, the court would note that substantive issues should not be allowed to blend imperceptibly.

## C. Standing

The question whether petitioner, a male, might avail himself of standing to challenge the alleged exclusion of females from service as grand jury forepersons has been addressed by neither party. The court is nevertheless aware of no reason why the matter should not be raised sua sponte.

### 1. Equal Protection

Traditionally, standing has been accorded only members of the allegedly ill-treated group when an attack is mounted upon equal protection grounds. In *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the Court refused to consider an allegation by a male petitioner that females had been improperly excluded from grand jury service, as follows:

> This claim . . ., when urged by a male, finds no support in our past cases. The strong constitutional and statutory policy against racial discrimination has permitted Negro defendants in criminal cases to challenge the systematic exclusion of Negroes from the grand juries that indicted them. Also, those groups arbitrarily excluded from grand or petit jury service are themselves afforded an appropriate remedy. But there is nothing in past adjudications suggesting that petitioner himself has been denied equal protection by the alleged exclusion of women from grand jury service.

---

**2.** Admittedly, statistical data that covered years prior to 1951 might unnecessarily skew the balance in petitioner's favor. Up until that time it might be said that in Tennessee *de jure* discrimination was practiced, since females were statutorily barred from serving on juries.

**3.** For example, rejecting an argument apparently set forth by counsel for the state and perhaps gently reproving him, the Court of Criminal Appeals supported its interpretation of *Mitchell,* an equal protection case, by citing various due process cases. *See* 614 S.W.2d at 79 n.3. *Cf. Duren v. Missouri,* 439 U.S. 357, 371, 99 S.Ct. 664, 672, 58 L.Ed.2d 579, 591 (1979) (Rehnquist, J., dissenting) ("The Constitution does not require, and our jurisprudence is ill served, by a hybrid doctrine such as that developed in *Taylor,* and in this case.").

**4.** *See Duren, supra,* 439 U.S. at 370–73, 99 S.Ct. at 671–73, 58 L.Ed.2d at 591–93 (Rehnquist, J., dissenting).

*Id.* at 633, 92 S.Ct. at 1226, 31 L.Ed.2d at 543 (citations omitted).[5] In *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), the Court explicitly held that "in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of *his race* or of the identifiable *group to which he belongs.*" *Id.* at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510. This court is not inclined to regard as accidental the inclusion of this very passage in *Mitchell*, the case so heavily relied upon by petitioner. *See Mitchell, supra,* 443 U.S. at 565, 99 S.Ct. at 3004, 61 L.Ed.2d at 755.[6] The rather straightforward policy underlying these statements is that prejudice cannot be presumed when a complainant is not a member of the group allegedly discriminated against.

Summarized simply, in *Alexander* a black was allowed to challenge alleged discrimination against blacks in the selection of grand jurors; in *Partida* a Mexican-American was allowed to challenge alleged discrimination against Mexican-Americans in the selection of grand jurors; and in *Mitchell* blacks were allowed to challenge alleged discrimination against blacks in the selection of grand jury forepersons. The court is aware of no case comparable to that *sub judice* in which the Court has sanctioned an equal protection attack by one not a member of the race or group allegedly victimized. There appears to be no reason why a new trail should be blazed here.

2. Due Process

Quite apart from the substantive difficulties that otherwise might be encountered by petitioner in pursuing a due process claim,[7] a question may be raised whether he should be found to have standing to raise a claim of gender discrimination. In the grand jury context,[8] petitioner would presumably be forced to rely upon *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). In that case, by plurality, a white petitioner was allowed to challenge on due process grounds the alleged exclusion of blacks from both grand and petit juries. Justice Marshall, in an opinion joined only by Justices Douglas and Stewart, recognized that "*if* the Sixth Amendment were applicable here, and petitioner were challenging a post-Duncan *petit jury,* he would clearly have standing to challenge the systematic exclusion of any identifiable group from jury service." *Id.* at 500, 92 S.Ct. at 2167, 33 L.Ed.2d at 92 (emphasis added). Treating the question carefully Justice Marshall opined that in any event the due process clause, apparently in combination with 18 U.S.C. § 243, justified a holding that petitioner in that case had standing. Section 243 explicitly makes racial discrimination in selection of either a grand or petit jury, whether in state or federal court, a federal crime. Standing was confirmed in *Peters* only through the concurring opinion by Justice White, in which Justices Brennan and Powell joined. Although he recognized "that there is no case in this Court setting aside a conviction for arbitrary exclusions of a class of citizens from jury service where the defendant was not a member of the excluded class," *id.* at 506, 92 S.Ct. at 2170, 33 L.Ed.2d at 96, Justice White stated that he nevertheless "would implement the strong statutory policy of § 243, which re-

---

**5.** In *Alexander* Justice Douglas alone would have reached the issue of gender discrimination. At that, he would have done so only by characterizing the case as one not resting upon the equal protection clause, implicitly recognizing that a male could not legitimately pursue such a claim otherwise. *See* 405 U.S. at 635 n. 2, 92 S.Ct. at 1227 n.2, 31 L.Ed.2d at 545 n. 2 (Douglas, J., concurring).

**6.** *Cf. Peters v. Kiff,* 407 U.S. 493, 509, 92 S.Ct. 2163, 2171, 33 L.Ed.2d 83, 97 (1972) (Burger, C. J., dissenting) ("[T]he Court has never intimated that a defendant is the victim of unconstitu-

tional discrimination if he does not claim that members of his own race have been excluded.").

**7.** *See* Part I(D)(1) *infra.*

**8.** *Cf. Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979) (gender discrimination raised by male in due process challenge to petit jury makeup); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (same).

flects the central concern of the Fourteenth Amendment with racial discrimination," *id.* at 507, 92 S.Ct. at 2170, 33 L.Ed.2d at 96.

A fair reading of *Peters* discloses that standing was conferred upon one not a member of the excluded class only because he alleged *racial* discrimination, which is specifically guarded against by statute. No remotely equivalent foundation supports petitioner's cause here, and the court would therefore find it difficult to hold that petitioner has standing to allege gender discrimination as a due process claim.

### D. The Substantive Bases

If by some means it should be presumed that petitioner has standing, he nevertheless would face severe difficulties in pursuing his claim of gender discrimination. More particularly, he would be left to proceed, if at all, only upon the allegation that he has been denied equal protection.

### 1. Incorporation Under the Due Process Clause

■ As has been noted, petitioner has argued that *Mitchell,* an equal protection case, should carry his cause to some extent, but he also seeks to draw substantial support from the sixth amendment as made applicable to the states by the fourteenth amendment. A fatal defect in this argument is that the sixth amendment does not purport to set forth any standard applicable in the grand jury context, and it has never been so applied. On the other hand, although the fifth amendment requires a grand jury in the context of federal prosecutions, that requirement has not been made applicable to the states by incorporation under the fourteenth amendment. *See Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). These two very basic considerations were obviously recognized in *Peters,* wherein Justice Marshall

concluded that "both the grand jury and the petit jury in this case must be measured solely by the general Fourteenth Amendment guarantees of due process and equal protection, and not by the specific constitutional provisions for the grand jury and the petit jury." *Peters, supra,* 407 U.S. at 496, 92 S.Ct. at 2165, 33 L.Ed.2d at 90. Although forced to dissent at the time, Justice Powell seems nevertheless to have articulated this principle correctly and concisely in *Partida* as follows:

> To the extent that the Fifth and Sixth Amendments are applicable, a defendant need only show that the jury selection procedure "systematically exclude[s] distinctive groups in the community and thereby fail[s] to be reasonably representative thereof." But in a state case in which the challenge is to the grand jury, only the Fourteenth Amendment applies, and the defendant has the burden of proving a violation of the Equal Protection Clause.

*Partida, supra,* 430 U.S. at 510, 97 S.Ct. at 1288, 51 L.Ed.2d at 520 (Powell, J., dissenting) (citations omitted).

A dead horse need be beaten no further. If petitioner has a viable claim of gender discrimination, it must rest upon the equal protection clause.

### 2. Equal Protection

If it should be conceded that petitioner has standing to assert a claim based upon the equal protection clause, respondent would be hard pressed to prevail on a contention that a prima facie case must be made out other than along the guidelines set forth in *Partida* and *Mitchell.* In many respects, respondent merely echoes here arguments that were clearly overridden in *Partida* and *Mitchell.* Their demise need not be reenacted blow by blow at this stage.[9] Petitioner has conformed his proof

---

**9.** It might be said briefly that certain aspects of respondent's argument, in fact, follow precisely the same course that Justice Powell took dissenting in *Partida. See* 430 U.S. at 507–18, 97 S.Ct. at 1287–92, 51 L.Ed.2d at 519–26 (Powell, J., dissenting). The suggested approach, essentially requiring a more particularized showing of discrimination by a petitioner, did not carry the day then and cannot do so now. Nevertheless, the court would emphasize that, as has been alluded to above, the exigency of more generalized proof that relies on statistical data

admirably to the steps set forth by *Partida* and *Mitchell* and it might even be appropriate to assume that he took each step in stride, but for the standing problem. Be that as it may. As has been stated in a slightly different context "[i]t is a separate question, however, whether petitioner is entitled to the relief he seeks." *Peters, supra,* 407 U.S. at 498, 92 S.Ct. at 2166, 33 L.Ed.2d at 91.

### F. The Relief Requested

■ Insofar as the relief sought here is concerned a major point apparently conceded by respondent taken for granted in the Court of Criminal Appeals, and for obvious reasons willingly embraced by petitioner is that *Mitchell* requires, if a prima facie case of discrimination in the selection of a grand jury foreperson be made out, that petitioner's conviction be set aside. This court is unwilling to make such a concession, for *Mitchell* did not so hold.[10] Notwithstanding the arguable likelihood that the Court might at some future date reach that conclusion in a case involving racial discrimination,[11] a palpably greater leap would be taken before the same result obtained in the area of gender discrimination. This perception rests most basically upon recognition that the ultimate policy considerations at work in the area of racial discrimination are much the stronger.[12]

In *Mitchell,* for the first time in nearly 30 years, a serious question was raised regarding the assumption that a conviction should be set aside as a matter of course upon a showing that discrimination had occurred in the selection of grand jurors. The position most directly opposing this long-lived premise was articulated by Justice Stewart, in an opinion joined by Justice Rehnquist, essentially resounding the objections posed by Justice Jackson in *Cassell v. Texas,* 339 U.S. 282, 298–305, 70 S.Ct. 629, 637–640, 94 L.Ed. 839, 853–56 (1950) (Jackson, J., dissenting). *See Mitchell, supra,* 443 U.S. at 574–79, 99 S.Ct. at 3009–12, 61 L.Ed.2d at 761–64 (Stewart, J., concurring). However that may be, careful analysis discloses that a majority of the justices participating in the *Mitchell* decision to a greater or lesser degree evidenced reluctance when confronted with the prospect, even in the area of racial discrimination, that a conviction might be set aside despite the fact that a verdict was rendered by a petit jury fairly selected in a trial free of constitutional error.[13]

In Part II of the Court's *Mitchell* opinion, Justice Jackson's position was rejected. Aside from such weight as might be attributed to considerations of stare decisis,[14]

---

is founded upon a key consideration not present here—that prejudice may be presumed in *Partida, Mitchell,* and like cases.

10. *See Mitchell, supra,* 443 U.S. at 551 n. 4, 99 S.Ct. at 2998 n. 4, 61 L.Ed.2d at 747 n.4.

11. Such action would necessarily include, at the very least, a determination that the role of the grand jury foreperson is such that discrimination in the selection process makes the conviction defective regardless of the prospect that, as in this case, the grand jury itself and the petit jury that rendered a guilty verdict were selected properly.

12. In this respect, the analysis of *Peters* undertaken above may well be deemed instructive, although that case concerned standing and examined that issue in the due process context.

13. Chief Justice Burger declined to join Part II of the Court's opinion, in which Justice Jackson's argument in *Cassell* was rejected, as did Justice Rehnquist. Justice Rehnquist, as has been noted, also joined in Justice Stewart's

concurring opinion, which would have expressly adopted Justice Jackson's approach. Justice Powell, in an opinion also joined by Justice Rehnquist, would have identified the attack upon their conviction by petitioners in *Mitchell* as "an abuse of federal habeas corpus." *Mitchell, supra,* 443 U.S. at 579, 99 S.Ct. at 3012, 61 L.Ed.2d at 764 (Powell, J., concurring). Furthermore, Justice Powell was not entirely satisfied with the Court's answer to Justice Jackson's contentions in *Cassell. Id.* at 587 n. 9, 99 S.Ct. at 3016 n. 9, 61 L.Ed.2d at 769 n. 9. The majority referred to by the court here would include Justice Stevens, who joined Part II of the Court's opinion only due to considerations of stare decisis. *See id.* at 593–94, 99 S.Ct. at 3019–20, 61 L.Ed.2d at 773–74 (Stevens, J., dissenting in part).

14. *See, e.g.,* 443 U.S. at 553, 99 S.Ct. at 2998, 61 L.Ed. at 748; *id.* at 593–94, 99 S.Ct. at 3019–20, 61 L.Ed.2d at 773–74 (Stevens, J., dissenting in part).

support was liberally and exclusively drawn from the unquestionably strong policy that discrimination based upon race should be expunged. The Court pointedly emphasized that "[d]iscrimination on account of race was the primary evil at which the Amendments adopted after the War Between the States, including the Fourteenth Amendment, were aimed," 443 U.S. at 554, 99 S.Ct. at 2999, 61 L.Ed.2d at 748, that "[i]t is clear from the earliest cases applying the Equal Protection Clause in the context of racial discrimination in the selection of a grand jury, that the Court from the first was concerned with the broad aspects of racial discrimination that the Equal Protection Clause was designed to eradicate," *id.* at 555, 99 S.Ct. at 2999, 61 L.Ed.2d at 749, that "in the first case establishing the principles that have guided the Court's decisions these 100 years, the Court framed the issue in terms of the larger concerns with racial discrimination in general that it understood as being at the core of the Fourteenth Amendment," *id.,* 443 U.S. at 555, 99 S.Ct. at 3000, 61 L.Ed.2d at 749, and that "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice," *id.,* 443 U.S. at 555, 99 S.Ct. at 3000, 61 L.Ed.2d at 749. After reviewing the societal costs that are to be expected when convictions are set aside in proceedings similar to *Mitchell,* the Court concluded that "[i]n any event, we believe such costs as do exist are outweighed by the strong policy the Court consistently has recognized of combating racial discrimination in the administration of justice." *Id.* at 558, 99 S.Ct. at 3001, 61 L.Ed.2d at 751.

The court views the relationship between the policy foundation illustrated above and the relief endorsed in *Mitchell* as crucial to the determination that petitioner here would not be entitled to the relief he seeks even were all other aspects of his claim made out in appropriate fashion. However severely alleged gender discrimination should be regarded, causes of that strain simply are not subjected to the strict and searching standard of review applicable to cases involving racial discrimination. The court would not disdain reference to "suspect classification" analysis under the equal protection clause in this area, albeit ostensibly disapproved elsewhere.[15] The policy supporting the relief sanctioned by *Mitchell* in no wise aids this petitioner. The court would thus deny him the relief he seeks.

### G. Conclusion

■ At least where the party is a male who challenges his conviction on the ground of alleged discrimination against females in the selection of the foreperson on the grand jury that indicted him, this court is for the reasons set forth above convinced that "[i]t hardly lies in the mouth of a defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice," *Cassell, supra,* 339 U.S. at 302, 70 S.Ct. at 639, 94 L.Ed. at 855 (Jackson, J., dissenting).

### II. Amendment of the Indictment.

Petitioner complains that the trial court allowed the prosecution in his case to amend the indictment against him by pretrial motion. The amendment deleted a reference to section 39–607 of the Tennessee Code Annotated, which proscribes assault with intent to commit robbery, and replaced it with a reference to section 39–3901, which proscribes robbery.

■ Petitioner asserts here only that the amendment was allowed in contravention of Rule .7(b) of the Tennessee Rules of Criminal Procedure. That claim was forthrightly addressed by the Court of Criminal Appeals,[16] and its resolution clearly hinges upon interpretation of Tennessee law. Where, as here, only considerations of state law are at issue, "[i]t [is] not the province of a federal habeas corpus court to re-examine these questions." *Rose v. Hodges,* 423 U.S. 19, 96 S.Ct. 175, 46 L.Ed.2d 162 (1975).

**15.** *See Beal, supra,* 614 S.W.2d at 79 n.3.

**16.** *See Beal, supra,* 614 S.W.2d at 80.

### III. Denial of Exculpatory Evidence

 Petitioner has raised a claim that the state withheld from him certain exculpatory evidence, in violation of his due process right as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Court of Criminal Appeals rather thoroughly reviewed the facts underlying this claim[17] and concluded that the evidence allegedly withheld "was merely cumulative of other proof introduced at trial." *Beal, supra,* 614 S.W.2d at 81. Without recounting the factual determinations made in the state court, which are presumed correct and in fact not challenged here, the court would merely indicate its agreement with the legal conclusion reached by the Court of Criminal Appeals. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

### IV. Sentence Pronounced in Petitioner's Absence

The Order of Conviction sentencing petitioner to a term in the state penitentiary was entered on October 31, 1971, *nunc pro tunc* August 28, 1979. Petitioner was not present when the sentence was formally imposed. The basis upon which relief is sought on this ground is directly comparable to petitioner's second claim, for it raises a question concerning how Rule 43 of the Tennessee Rules of Criminal Procedure should be interpreted.

Respondent has asserted that as to this claim petitioner has failed to exhaust available state remedies. Petitioner on the other hand, while admitting that a post conviction relief petition has been pending since May 7, 1981, argues that "[i]n view of the trial court's evidenced lack of interest in petitioner's claim this court should ... exercise its discretion to review claim four

**17.** *See Beal, supra,* 614 S.W.2d at 80–81.

**18.** In addition, although petitioner is represented by appointed counsel in this proceeding he has recently submitted a motion *pro se,* ostensibly in an effort to block any further proceedings in the trial court related to the post conviction relief petition. Specific reference is appropriate here to Rule 1(f)(4) of the Local Rules of

... notwithstanding the technical lack of exhaustion."[18]

 Initially, the court would be inclined to dismiss this claim for failure to exhaust available remedies. Moreover, the policy of comity which weighs heavily in federal habeas corpus proceedings would be ill served by any attempt on the part of this court to preempt a state court's decision on this issue. Thereafter, the court should refuse to step outside its province by re-examining the state court determination. *See Hodges, supra.*

Court, which states that "[w]henever a party has appeared by attorney, he may not thereafter appear or act in his own behalf in the action or proceeding, or take any step therein" except in limited circumstances. In any event, it goes without saying that this court has no power to either block or encourage such a state court proceeding.